393 A.2d 1263

**COMMONWEALTH of Pennsylvania**

v.

**Marty RILEY, Appellant.**

Superior Court of Pennsylvania.

Submitted June 12, 1978.

Decided Nov. 14, 1978.

Roy H. Davis, Assistant Public Defender, Drexel Hill, for appellant.

Frank T. Hazel, District Attorney, Media, for Commonwealth, appellee.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

HESTER, Judge:

This appeal arises out of an incident that occurred on November 1, 1976, at approximately 10:00 P. M. Appellant, with two companions, entered the Crooked Penny Bar in Darby Township, Delaware County, Pennsylvania. Shortly following this, a patron, Raymond Ferraccio, became engaged in an argument with a companion of the appellant, John Stanley. The appellant, during the course of this argument, left the bar, returned a few minutes later, pulled the telephone receiver from the wall, walked toward Mr. Ferraccio, pointed a pistol at his head and said, "You're a dead M_____ F_____." The appellant then fired the pistol, the bullet struck Mr. Ferraccio in the head and he fell to the floor. An off-duty policeman in the bar heard the shot and approached appellant, who then pointed the gun at the officer's chest. Someone yelled, "Don't shoot, he's a cop," whereupon appellant and his companions ran from the bar.

On the same night (November 1, 1976), a complaint was filed before a District Magistrate in Delaware County, charging appellant with various crimes (including attempted murder) arising out of the above described incident.

The appellant was arrested on December 31, 1976 pursuant to a warrant issued on November 6, 1976 on an unrelated charge of robbery. On January 4, 1977, a Preliminary Arraignment was held on the robbery charge. The appellant was detained in the Delaware County Prison following his failure to post bond.

On February 18, 1977, the appellant moved to quash the information brought against him pursuant to the complaint filed November 1, 1976 on the ground that he had not been accorded a preliminary arraignment or hearing.

A preliminary arraignment and hearing were held on February 28, 1977, and appellant was held for court.

Appellant initially argues that the failure to provide him a preliminary arraignment and hearing within the time provided by the Rules of Criminal Procedure requires that he be discharged.

Rule 122 of the Pennsylvania Rules of Criminal Procedure provides: "when the defendant has been arrested, with a warrant, within the county where the warrant of arrest was issued, where the complaint charges a court case, he shall be taken without unnecessary delay before the issuing authority whose name appears upon the warrant for preliminary arraignment."

Further, Rule 140(f) provides that the preliminary hearing shall be held no less than three nor more than ten days after the preliminary arraignment.

Appellant was arrested on December 31, 1976 on an unrelated charge and arraigned on that charge on January 4, 1977. No arraignment or preliminary hearing was held on the charges in this case until February 28, 1977.

While we disapprove of the obviously careless procedure in this case, we do not think it merits discharge.

Here, the appellant was already in jail and suffered no prejudice by the delay. The purpose of Rules 122 and 140 are to protect the right of an accused against unlawful detention. *Commonwealth v. Mullen,* 460 Pa. 336, 333 A.2d 755 (1975). We find no other prejudice to the appellant and despite the technical violation of the rules, we do not believe appellant's discharge is mandated. See *Commonwealth v. DeCosey,* 246 Pa.Super. 412, 371 A.2d 905 (1977).

Appellant's second contention is that the evidence presented at trial was insufficient to support a conviction of criminal attempt (murder).

Viewing the evidence in light most favorable to the Commonwealth, the verdict winner, *Commonwealth v. Smith,* 238 Pa.Super. 422, 357 A.2d 583 (1976), we find the evidence sufficient to support the conviction of criminal attempt (murder). The testimony leaves no doubt that the Commonwealth sufficiently satisfied its burden.

The victim, Raymond Ferraccio testified as follows:

Q. So you saw him (appellant) coming back in the bar and you say he was, he ripped the receiver off the phone. Would you describe that?

A. Yeah, he took the receiver off the pay phone at the door and tore the wire off.

Q. Did that appear to put it out of commission?

A. Yeah.

Q. Then what did he do?

A. Pointed a gun at me.

Q. Now, what type of gun did it appear to be?

A. Some kind of handgun.

Q. Can you describe the size and color?

A. No.

Q. Anything about this?

A. No.

Q. Could you describe the barrel of the gun?

A. Yeah.

Q. Can you tell us whether it was a revolver or an automatic?

A. No, I couldn't tell.

Q. Where did he point the gun?

A. My head.

Q. How close was it to you?

A. A couple of feet.

Q. Did he make any statement to you?

A. Yeah, he told me I was a dead mother f. Then, he fired.

Q. Could you tell us where this bullet went?

A. It hit me in the head and then richocheted into the wall.

(N.T., Pg. 8–9)

The owner of the bar where the incident took place, John McBride, then substantiated Mr. Ferraccio's story:

Q. Now, after he (appellant) did this to the phone, did you see what he did next?

A. Yeah, he aimed the gun at Ray Ferraccio and he shot him.

Q. How did he approach Mr. Ferraccio, like how far was the phone from where the victim, Mr. Ferraccio, was standing?

A. The phone from the victim?

Q. Right?

A. Seven or eight feet.

Q. And did he approach Mr. Ferraccio physically?

A. No, he walked around the foyer and stood maybe, I don't know, eight, seven feet, nine feet away from him and shot him.

Q. Okay. Could you see how he shot him where he had this weapon?

A. He had the weapon in his hand. Heaimed the fun and shot him.

(N.T., Pg. 52–53)

Finally, a customer in the bar, Mr. Jack Wadlinger, gives additional corroboration:

Q. Okay. Then, could you describe what the defendant (appellant) did?

A. He left.

Q. Okay, and how long after did he leave?

A. A few minutes.

Q. And then what happened?

A. He came back in.

Q. What did he do when he came back in?

A. He pointed a gun at Ray Ferraccio.

Q. How close did he get to Ray Ferraccio?

A. A few feet.

Q. Did he say anything before he pointed the gun?

A. Yes, he did.

Q. What did he say?

A. Exactly?

Q. Well—

A. "You are a dead m-fer."

Q. Did he have anything in his hand?

A. He had a gun.

Q. And was he holding it by one hand or two?

A. Two hands.

Q. Where did he point the gun?

A. Directly at Ray.

Q. Toward what part of his body?

A. His head.

Q. Now, could you see what angle his hands were to the floor? Was he pointing downwards, level or upwards?

A. He was pointing level.

Q. Okay. Did you see when he fired this weapon?

A. Yes, I did.

Q. Could you see any result of that firing?

A. Well, Ray slumped over to the bar.

(N.T. 74–75)

We are of the opinion that this testimony, according all inferences to the Commonwealth, is clearly sufficient to sustain the conviction of attempted murder.

Judgment of sentence affirmed.

SPAETH, J., files a dissenting opinion.

HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, dissenting:

As I read *Commonwealth v. Hailey*, 470 Pa. 488, 507, 368 A.2d 1261, 1271 (1977), an indictment will not be quashed if the defendant has shown no prejudice *and* there has been "substantial compliance" with Rule 140(f). In *Commonwealth v. DeCosey*, 246 Pa.Super. 412, at 418, 371 A.2d 905, at 908 (1977), in a concurring opinion, I asked, "Who knows, or can predict, what 'substantial compliance' means?" Whatever the answer, there wasn't substantial compliance here. In *Hailey*, compliance was missed by only one day, in *DeCosey*, by only four days; here it was missed by almost two months.

I should therefore vacate the judgment of sentence and quash the indictment.